NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

---------------------------------------------------------------X

In re:                                                                  Bankruptcy Case No. 15-23943

Frenchtown Drug Store, Inc.                                     Chapter 11

        Debtor
                                                                              **MEMORANDUM OPINION**

---------------------------------------------------------------X


**APPEARANCES**


David L. Marshalll, Esquire
Eastburn & Gray, PC
60 East Court Street
Doylestown, Pennsylvania 18901
*Attorney for Debtor*

Michael S. Weinstein, Esquire
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, New York 10022
*Attorney for Rochester Drug Cooperative, Inc.*

Michael J. Shavel, Esquire
Hill Wallack LLP
21 Roszel Road
PO Box 5226
Princeton, New Jersey 08543
*Attorney for Interested Parties Albert and Karen Giarretta*


**KATHRYN C. FERGUSON, CHIEF U.S.B.J.**

1

Frenchtown Drug Store, Inc. ("Debtor") filed an Amended Chapter 11 Small Business Plan on May 14, 2016. Rochester Drug Cooperative, Inc. ("RDC") filed an objection to the Amended Plan on June 16, 2016. The Debtor filed a response to the objection on June 30, 2016. On July 7, RDC filed a reply in further support of its objection. The court took testimony on confirmation of the Amended Plan on July 14, 2016, and reserved decision.

The proponent of a chapter 11 plan bears the burden of establishing that the plan complies with each requirement of 11 U.S.C. § 1129.[1] One of those requirements is that "[w]ith respect to each class of claims or interests – (A) such class had accepted the plan; or (B) such class is not impaired under the plan."[2] The Amended Plan classifies RDC as an unsecured creditor in Class 4, which is designated as impaired.[3] The Debtor filed a Report on Ballot Tabulation For Amended Plan[4], which reported that 2 creditors from Class 4 with claims totaling $57,000 had submitted ballots accepting the Amended Plan, and 2 creditors from Class 4 with claims totaling $488,393 had submitted ballots rejecting the Amended Plan. A class is deemed to have accepted a plan if it has been accepted by creditors that hold more than one-half of the number of allowed claims, and at least two-thirds in the amount of allowed claims.[5] RDC, which filed a claim in the amount of $462,544.77, submitted a ballot rejecting the Amended Plan; therefore, Class 4 has rejected the Amended Plan and the Debtor cannot satisfy § 1129(a)(8).

The Debtor has another option for obtaining confirmation of a chapter 11 plan. Section 1129(b) provides that if all of the requirements of § 1129(a) are met with the exception of § 1129(a)(8), a court may still confirm the plan if its finds that the plan "does not discriminate

---

[1] *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233 (S.D.N.Y. 2014)
[2] 11 U.S.C. § 1129(a)(8)
[3] For confirmation purposes, a claim is "impaired" under the Bankruptcy Code unless the proposed treatment in the plan "leaves unaltered the legal, equitable, and contractual rights" of the holder of the claim. 11 U.S.C. § 1124
[4] Doc. 128
[5] 11 U.S.C. § 1126

2

unfairly, and is fair and equitable, with respect to each class of claims or interest that is impaired under, and has not accepted, the plan."[6]

RDC has objected to confirmation under § 1129(b) on the ground that the Amended Plan is not fair and equitable. "Fair and equitable" is defined differently for secured and unsecured creditors. For unsecured creditors,[7] such as Class 4, a plan must provide "that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."[8] This is known as the absolute priority rule. Class 4 creditors under the Amended Plan are not being paid in full,[9] so the absolute priority rule dictates that junior creditors, such as equity holders, cannot receive or retain any property. The Amended Plan provides that Class 5 (equity interest) "will acquire a new interest in the Debtor in exchange for new value," invoking what is commonly known as the new value exception to the absolute priority rule.

The Amended Plan does not define the parameters of the proposed new value contribution and the Debtor's statements regarding new value are vague and somewhat contradictory. The summary of the Amended Plan states that the "reorganizing Plan will be funded by a new value contribution made by Albert Giarretta[10] in the amount of $50,000. The

---

[6] 11 U.S.C. § 1129(b). This is known as the "cramdown" provision.
[7] The court is not making a finding that RDC is an unsecured creditor. If necessary, that determination will be made in the pending adversary proceeding [15-2117]. For purposes of this opinion only, the court will regard RDC as properly classified as an unsecured creditor.
[8] 11 U.S.C. § 1129(b)(2)(B).
[9] The proposed treatment is quarterly payments over three years totaling 11.4% of the allowed amount of the unsecured claims. At the confirmation hearing, Debtor's counsel confusingly stated that an 8% dividend to unsecureds is better than nothing.
[10] Albert Giarretta is the sole shareholder of the Debtor. *See,* Amended Plan Sec. 1.3

3

contribution will be made from his separate estate."[11] The summary also provides that "[s]hould the Court confirm the reorganizing plan, then Albert Giarretta will release his super-priority claim and secured claim. The total new value will be the sum of the debt that is forgiven plus cash to provide a benefit to the estate of $50,000." By contrast, Section 2.1(C) of the Amended Plan makes the new value contribution contingent on the Debtor prevailing in its adversary proceeding against RDC. Section 2.1(C) states: "If Debtor prevails in the Adversary Action, Albert Giarretta will advance $50,000 to Debtor as new value for his equity interest in the Debtor, either in the form of (i) a forgiveness of the superpriority administrative expense or in the form of cash, or (ii) a combination of both, such that the total contribution equals $50,000." In Section 2.5 [Means for Implementation of the Plan] it states the "Plan will be funded by the reorganized Debtor's future income and by the contribution of new value by Albert Giarretta." In that section, the new value contribution is not made contingent on the outcome of the adversary proceeding.

Adding to the confusion is that the Amended Plan does not specify a dollar figure for the amount of cash versus debt forgiveness that will be involved in the new value proposal. Exhibit 4 to the Amended Plan [Feasibility Analysis] states that in order for the Debtor to have enough cash on hand on the effective date to make all required payments, the Debtor will obtain $40,000 from DIP financing. In October 2015, the court approved the Debtor's request to obtain a revolving credit facility pursuant to § 364(c) in an amount up to $50,000 from Albert and Karen Giarretta "to operate the Debtor's business."[12] At the confirmation hearing, Mr. Giarretta testified that he had already loaned the Debtor $23,000 under the DIP credit facility since the filing, and that he only proposed to provide the Debtor with $27,000 in new money.

---

[11] Albert Giarretta has not filed a separate bankruptcy petition, so it is unclear what the term "estate" refers to.
[12] Doc. 57

As described by the Supreme Court in *LaSalle*, the new value exception to the absolute priority rule contemplates that shareholders may retain an ownership interest in the reorganized debtor if the shareholders "contribute new capital in money or money's worth, reasonably equivalent to the property's value, and necessary for successful reorganization of the restructured enterprise."[13] It is worth noting that in *LaSalle* the Supreme Court explicitly declined to rule on the issue of whether a new value exception or corollary to absolute priority rules exists. The *LaSalle* court simply held that plans that provide junior interest holders with exclusive opportunities free from competition and without the benefit of market valuation do not satisfy § 1129(b)(2)(B)(ii).

For the purposes of this analysis, the court will assume that a new value exception to the absolute priority rule of § 1129(b)(2)(B)(ii) exists. In this case, the new value proposal appears to be a mixture of debt forgiveness and a cash payment.[14] The clear majority of courts that have considered the issue have found that debt forgiveness does not constitute new value.[15] As explained in a recent decision, "the forgiveness of debt [] does not represent new money that may actually be spent upon receipt, barring it from being considered new value."[16] To qualify as "money or money's worth," a new value contribution

> must be freely tradeable in the market by the debtor; and it must be an asset in the accounting sense. The contributor must be bearing a new economic risk—it is not enough that the contributor of "new" capital is simply continuing

---

[13] *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 (1999) (citing Case v. Los Angeles Lumber Products Co., 308 U.S. 106 (1939))

[14] It is unclear from the Amended Plan whether the proposal is merely to forgo the superpriority status on money already loaned or to forgo repayment of that amount entirely. Under either scenario, that may not be considered new value.

[15] *See, e.g., In re Snyder*, 967 F.2d, 1126 (7th Cir.1992) (release of lien does not constitute an infusion of money or money's worth because it has no place on the asset column of the balance sheet of the new entity); *Sun Valley Newspapers, Inc. v. Sun World Corporation (In re Sun Valley Newspapers, Inc.)*, 171 B.R. 71 (9th Cir. BAP 1994) (release of claims by insiders does not constitute a capital contribution to the debtor because such a release is not up front and is not an infusion of new funds); *but see, In re Future Energy Corporation*, 83 B.R. 470, 498 (Bankr. S.D. Ohio 1988) (release of secured claims constitutes a capital contribution since the transaction benefits the debtor and places the shareholder in a position of economic risk)

[16] *In re Fairvue Club Properties, LLC*, 2010 WL 4975641 (Bankr. M.D. Tenn. 2010)

> an existing risk, satisfying an existing risk, or only changing the form of an existing risk. Forgiveness of debt by itself is not sufficient[17]

This court agrees. Unless a proposed contribution increases a debtor's net assets available for immediate distribution to creditors it is not "new value." By that standard, the only portion of the Mr. Giarretta's proposed contribution that may be considered new value is the $27,000.

The Debtor's brief in support of confirmation argues that in evaluating the new value contribution the court must also consider: Mr. Giarretta's reduced salary, the lease, and the restrictive covenant. Arguing that Mr. Giarretta's reduced salary is new value is a nonstarter. The Supreme Court has long recognized that a contribution of "labor, experience, and expertise by a junior interest holder is not money's worth".[18] Perhaps in recognition of that, the Debtor asks the court to not only consider Mr. Giarretta's offer to work for a reduced salary, but also to consider what it might cost the reorganized debtor to replace Mr. Giarretta with another full time pharmacist. In asking the court to consider that, the Debtor is conflating the concept of new value with the Debtor's going concern value. Increased labor costs are only relevant to the latter. Under the terms of the Amended Plan, Mr. Giarretta will be retaining all of the future profits of the reorganized debtor, so his proposed salary reduction only redounds to his benefit, further reinforcing why it cannot be considered a new value contribution. As for the lease, the court is unclear on how that is being "contributed" to the Debtor. Mr. Giarretta did not testify that upon confirmation he intended to put the lease in the name of the Debtor. Even if allowing the reorganized debtor to take advantage of the existing lease could be considered a contribution, the Debtor has failed to establish that the current lease is a below market lease. The Debtor did not present any evidence at the confirmation hearing regarding the current market rate of leases in

---

[17] 1 *In re Creekside Landing, Ltd.*, 40 B.R. 713 (Bankr. M.D. Tenn. 1992)
[18] *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988)

the Frenchtown area. It is a plan proponent's burden to establish all of the elements necessary for confirmation, and on the issue of the value of the lease the Debtor failed to come forward with any competent evidence. Finally, the Debtor wants the court to consider the restrictive covenant. The restrictive covenant as new value is more of a chimera than the lease contribution. Mr. Giarretta testified unequivocally at the confirmation hearing that he was not willing to enter into a restrictive covenant in favor of a third-party. Mr. Giarretta's unwillingness to provide a potential buyer with a restrictive covenant may be relevant to the going concern value of the business, but his willingness to continue to provide services to the reorganized debtor with a restrictive covenant is not a contribution of new value.

Overall, the court finds that none of these additional items constitute money or money's worth so that they may be considered in evaluating a new value offer. As one court noted, "[a] rigorous showing as to these requirements is necessary in order to ensure that a debtor's equity holders do not eviscerate the absolute priority rule by means of contrived infusion."[19] Everything the current shareholder claims to be contributing, aside from the $27,000, is a contrived infusion.

As one court has formulated the standard, "[a] Chapter 11 plan proponent calling upon the new value exception has the burden of proving that the equity holders capital contribution is: (1) in the form of money or money's worth; (2) necessary to the reorganization; (3) reasonably equivalent to the value of the interest being retained; (4) up front; and (5) substantial."[20]  Having determined that the new value being offered is limited to the $27,000, the court does not have to decide whether the proper valuation to measure that contribution against is going concern value or liquidation value because under either valuation standard the court finds that the contribution is neither "reasonably equivalent to the value of the interest being retained" nor "substantial".

---

[19] *In re Sea Garden Motel & Apartments*, 195 B.R. 294 (D.N.J. 1996)
[20] *In re Haskell Dawes, Inc.*, 199 B.R. 867, 871 (Bankr. E.D. Pa. 1996)

The Debtor has proffered that the liquidation value of the Debtor is $117,580. Even using the liquidation value, which the Debtor argues is appropriate in a personal services situation, the offer of $27,000 does not measure up. In *Torgro*,[21] the bankruptcy court held that an equity holder's right to receive a personal benefit such as a salary from the debtor must be considered when evaluating reasonably equivalent value. In this case, Mr. Giarretta will be receiving a salary from the reorganized debtor so that salary must also be considered part of the value of the interest being retained. In sum, Mr. Giarretta proposes to retain all of the equity in the reorganized debtor, receive a salary, and retain 100% of any future profits, by paying less than a quarter of the liquidation value of the Debtor. In return, creditors can hope to receive less than 10% on their claims over a three-year period. Simply put, Mr. Giarretta's offer of $27,000 is not reasonably equivalent to the value of the interest he is retaining.

In analyzing whether a new value contribution is "substantial" courts have examined whether "creditors will share in the potential growth of the newly capitalized debtor, or whether the shareholder's new equity position will have the potentiality of only benefitting the shareholders under the plan."[22] Here, the only upside potential lies with the reorganized debtor and all of the downside risk lies with the creditors. According to the Debtor's most recent cash flow projections, after all of the payments called for under the Amended Plan, the Debtor will realize a profit of $76,669 in the next fiscal year. That must be compared to the mere $60,000 that will be paid to unsecured creditors. Moreover, those payments are not up front, they are stretched over three years with the first payment not due until thirty days after the Amended Plan's effective date. The effective date itself is illusory. The payments may never have to be made. The Amended Plan provides that:

---

[21] *In re Torgro Atlantic City, LLC*, 2009 WL 1288367 (Bankr. D.N.J. 2009)
[22] *Sea Garden Motel*, 195 B.R. at 302

> The Effective Date will be the later of (i) a date 30 days from the date on which the Order in the Adversary Action voids the security interest of Rochester Drug Cooperative or (ii) the date on which the Confirmation Order becomes a Final Order.
> Should the Court rule in favor of Rochester Drug Cooperative in the adversary action; thereby giving effect to the financing statement and making Rochester Drug Cooperative a secured party, then Debtor will either move to convert to Chapter 7 or dismiss the case.

The trial date for that adversary proceeding is set for November 2, 2016. In the best case scenario, creditors would not be entitled to their first payment until sometime in 2017, and then only if the reorganized debtor prevails. If the reorganized debtor cannot avoid RDC's security interest, then it will simply move to dismiss or convert without ever making a single payment to creditors.  A plan that places all of the risk on creditors in return for a small cash contribution cannot satisfy the test for new value.

The court finds that the Debtor's Amended Plan does not satisfy § 1129(b)(2)(B)(ii). Confirmation is denied.  The court will enter an order in accordance with this opinion.

*/s/ Kathryn C. Ferguson*
KATHRYN C. FERGUSON
Chief Judge, US Bankruptcy Court

Dated:  August 8, 2016

9